UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

ALEXANDRA SANCHEZ, DIANA      )
ALLEN, SHERI DUHME, and DEANNA )
BRUMBAUGH                      )
                              )
        Plaintiffs,           )
                              )
v.                            )        Case No. 4:23-cv-04007-SLD-RLH
                              )
ROCK ISLAND COUNTY HEALTH     )
DEPARTMENT and ROCK ISLAND    )
COUNTY,                       )
                              )
        Defendants.           )

ORDER

        Before the Court are Defendant Rock Island County, Illinois's ("the County") Motion for

Summary Judgment, ECF No. 43; Defendant Rock Island County Health Department's

("RICHD") Motion for Summary Judgment or Partial Summary Judgment, ECF No. 45; and

Plaintiffs Diana Allen, Deanna Brumbaugh, Sheri Duhme, and Alexandra Sanchez's Motion for

Summary Judgment, ECF No. 48.  For the reasons that follow, the County's Motion for

Summary Judgment is DENIED; RICHD is dismissed as a party from this case and its Motion

for Summary Judgment, which is DENIED IN PART and GRANTED IN PART, is treated as if

it was filed by the County; and Plaintiffs' Motion for Summary Judgment is DENIED IN PART

and GRANTED IN PART.

**BACKGROUND**[1]

        Plaintiffs were hired by RICHD.  In September 2021, RICHD adopted an employee

COVID-19 vaccination policy.  Each Plaintiff submitted a request for exemption from the policy

---

[1] Unless otherwise noted, the facts in the background are drawn from RICHD's statement of undisputed material facts.  *See* RICHD's Mot. Summ. J. 3–12.

1

to Nita Ludwig, the chief executive officer of RICHD.  After submission of their exemption requests, each Plaintiff met one-on-one with Ludwig to discuss their objections.  On October 15, 2021, Ludwig denied each Plaintiff's request for exemption.  Plaintiffs were given an opportunity to begin the vaccination process and were suspended without pay for two weeks after they refused to do so.  Plaintiffs returned to work on November 1, 2021.

After confirming that no Plaintiff had started the vaccination process, Ludwig terminated them.  That same day, Plaintiffs' labor union filed grievances to challenge each termination.  In December, RICHD denied the grievances.  The parties then proceeded to arbitration.  In September of 2022, the arbitrator granted Plaintiffs back pay and benefits and ordered their reinstatement.

Each Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that RICHD discriminated against them.  Subsequently, Plaintiffs filed complaints against RICHD in state court for religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17.  Their cases were removed to federal court and later consolidated.  Plaintiffs added the County as a Defendant in their Amended Complaint; each Plaintiff asserts one claim of Title VII religious discrimination against the County and one claim of Title VII religious discrimination against RICHD.  *See generally* Am. Compl., ECF No 27.  RICHD asserts as a defense that allowing Plaintiffs an exemption from the vaccination requirement would be an undue hardship.  RICHD Answer 24, ECF No. 31.

The County moves for summary judgment on the claims against it on the basis that it was not Plaintiffs' employer, among other arguments.  Cnty.'s Mot. Summ. J. 14–18.  The Court directed the parties to brief the issue of whether RICHD is a suable entity separate from the

County, Aug. 19, 2025 Text Order, which they have done, *see* Defs.' Suppl. Br., ECF No. 59; Pls.' Suppl. Br., ECF No. 60.  RICHD moves for summary judgment in its favor on the undue hardship defense and as to some of Plaintiffs' requested damages.  RICHD's Mot. Summ. J. 13–21.  Plaintiffs move for summary judgment in their favor on their Title VII claims and on the undue hardship defense.  Pls.' Mot. Summ. J. 2.

The Court will discuss any additional relevant facts along with its analysis.

## DISCUSSION

### I.    Is RICHD a Suable Entity?

A government agency or county's capacity to sue and be sued is determined by "the law of the state where the court is located."  Fed. R. Civ. P. 17(b)(3).  "To be sued in Illinois, a defendant must have a legal existence, either natural or artificial."  *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 n.2 (7th Cir. 2000) (quotation marks omitted).  The statutes governing county health departments make no explicit mention of whether health departments have separate legal existences from counties.  *See generally* 55 ILCS 5/5-25001 to 5-25003.

Courts have found that local government subdivisions are separate legal entities when the statutes creating those subdivisions explicitly outline a capacity to sue or be sued.  For example, when a statute stated that "the [subdivision] shall be a body politic and corporate . . . and by that name may sue and be sued in all courts and places where judicial proceedings are had," a court found the government subdivision to be a separate legal entity.  *Turner v. City of Chi. Bd. of Educ.*, No. 17 C 6507, 2018 WL 3218706, at *7–8 (N.D. Ill. July 2, 2018) (quotation marks omitted).  The statutory schema creating Illinois county health departments, including RICHD, does not include any similar language to that of *Turner* nor any explicit creation of a separate legal entity.

3

Courts have also found a government subdivision to be a separate legal entity from a county when the subdivision's "general level of autonomy" is so high that it logically becomes "a separate legal entity that is amenable to suit under the Federal Rules of Civil Procedure." *Nixon v. Smith*, No. 10 C 1382, 2011 WL 3236042, at *3 (N.D. Ill. July 26, 2011).  For example, the *Nixon* court found the Lake County Metropolitan Enforcement Group ("LCMEG") to be a suable entity based on the statutory requirements that LCMEG "be composed of [two] or more units of local government"; "maintain an MEG Policy Board composed of an elected official . . . and the chief law enforcement officers from each participating unit of local government"; and "designate a financial officer to receive the funds" it receives from "the state and its local government units."  *Id.* (quotation marks omitted) (second alteration in original).  Though acknowledging that LCMEG had reporting requirements and was required to cooperate with the Illinois State Police, the court concluded that these powers and responsibilities created enough autonomy from the Illinois State Police that the legislature's intent must have been to create a separate legal entity.  *See id.*

The relevant Illinois statutes for community health departments provide far fewer powers. Where the statute governing LCMEG required composition of at least two local government units, adjacent counties may "by resolution" join together to form one health department.  55 ILCS 5/5-25001.  More distinct still, the Court here is considering a single-county health department which by statute can only have been created by resolution of the county board, *id.*, or by the county board after a successful voter petition, *id.* 5/5-2003.  Where LCMEG received funds from both the state and local governments and was required to establish one designated financial officer for fund management, a county health department's budget and expenditures are subject to far more control by the county.  The county board levies the tax to fund a county

4

health department, *id.* 5/5-25010, the board of health authorizes payment of the department's expenses from "the County Health Fund" created from the taxes collected, *id.* 5/5-25013(A)(12); *id.* 5/5-25011, the health department's budget requires county board approval, *id.* 5/5-25010, and the board of health is required to submit an annual report to the county board "explaining all of its . . . expenditures," *id.* 5/5-25013(A)(14). Because the statutory schema creating Illinois county health departments such as RICHD does not establish a comparable level of autonomy as in *Nixon*, this also fails to provide a basis for finding RICHD to be a suable, separate legal entity.

Defendants contend that RICHD is a suable entity, relying on a 1988 Northern District of Illinois opinion holding the Boone County Board of Health was a suable legal entity by implication of its expressly bestowed powers. *Redschlag v. Klint*, No. 87 C 20475, 1988 WL 124933, at *5 (N.D. Ill. Sept. 14, 1988). Defendants argue that county health departments are granted extensive independent powers, including the power to contract and acquire real estate, creating an implied power for RICHD to sue and be sued in its own name. Defs.' Suppl. Br. 3–4. (It is worth noting, however, that Defendants are relying on several powers of county boards of health, not the health departments themselves. RICHD, not the Rock Island County Board of Health, is a Defendant in this suit.)

The Court rejects this argument for several reasons. First, *Redschlag* is neither binding on nor persuasive to this Court. It is almost forty years old but, despite its age, has not been cited by another court, at least to the Court's knowledge. Additionally, and more significantly, the Court does not agree with *Redschlag*'s foundational reasoning. *Redschlag* relies on a 1962 Illinois Supreme Court case, *Heidenreich v. Ronske*, 187 N.E.2d 261 (Ill. 1962), for the proposition that counties have express powers as well as powers "aris[ing] from necessary implication from expressly granted powers." *Redschlag*, 1988 WL 124933, at *5 (quoting

*Heidenreich*, 187 N.E.2d at 262–63). But importantly, *Heidenreich* recognizes implied powers

for *counties*, not for subdivisions of counties. *Heidenreich*, 187 N.E.2d at 262 ("It is clear that a

*county* is a mere creature of the State and can exercise only the powers expressly delegated by

the legislature or those that arise from necessary implication from expressly granted powers."

(emphasis added)); *see also id.* at 266 (concluding that the state did not "delegate[ ] to the

county, either expressly or by necessary implication" the power at issue in that case). This Court

does not find it convincing that *Heidenreich* intended for the implied powers of counties to be

then turned into implied powers for subdivisions of counties. Additionally, *Heidenreich*, at over

sixty years old, has not been cited in over thirty years—it does not represent a well-established

principal of Illinois law. Moreover, the two most recent cases citing to *Heidenrich*—other than

*Redschlag*—are about whether units of local government have authority to enact liquor laws.

*See, e.g.*, *Munch v. Village of Vernon Hills*, 642 N.E.2d 882 (Ill. App. Ct. 1994); *Peoria v.

Johnson*, 521 N.E.2d 576 (Ill. App. Ct. 1988). Thus, the Court is unconvinced by Defendants'

reliance on the *Redschlag* and *Heidenreich* line of reasoning.

Plaintiffs argue that RICHD is not a suable entity under both the statutes and caselaw.

*See* Pls.' Suppl. Br. 1. To counter *Redschlag*, Plaintiffs reference a more recent case from the

Northern District of Illinois.[2] *See generally Ryder v. Cook Cnty. Dep't of Pub. Health*, No. 22

CV 626, 2023 WL 2745679 (N.D. Ill. Mar. 31, 2023). In that case, the plaintiffs sued the Cook

County Department of Public Health ("CCDPH") for violating their First Amendment rights to

freedom of association and free exercise by prohibiting them from eating indoors without the

---

[2] Plaintiffs also cite a Fourth Circuit case, *Avery v. Burke County*, 660 F.2d 111 (4th Cir. 1981), to support their
stance that, unless a statute clearly establishes an entity's independence, it remains a mere subdivision of a county.
*Avery*, while potentially factually similar to this case, is entirely unpersuasive in its legal analysis and implications
since it considers North Carolina statutes. *Id.* at 114 (finding that "[n]either the Board of Health nor the Board of
Social Services is a legal entity separate and apart from the county").

COVID-19 vaccine. *Id.* at *1. The court held that CCDPH was not a suable, independent legal entity. *Id.* at *3. *Ryder* is both more factually analogous to the case at hand than *Redschlag* and better aligned with the modern trend of Illinois federal courts holding that subdivisions of counties are not suable entities unless statutory language states otherwise. *See, e.g.*, *Hopkins v. Kane Cnty.*, No. 05 C 3147, 2006 WL 560473, at *4 (N.D. Ill. Mar. 2, 2006) (finding the Kane County Division of Transportation is not a suable entity); *Khan v. Cook Cnty. Dep't of Pub. Highways*, No. 93 C 1375, 1994 WL 523703, at *2 (N.D. Ill. Sep. 23, 1994) (holding that the Cook County Department of Highways is not a suable entity); *Harris v. Dart*, No. 20 C 7602, 2023 WL 2988816, at *3 n.2 (N.D. Ill. Apr. 18, 2023) (holding that Cook County Health and Hospital Systems and Cermak Health Services of Cook County "do not have a legal existence separate from the county and thus are not proper parties").

Finding nothing specific in the statutes governing RICHD that would support its having an independent legal existence, and in line with the modern trend in the caselaw, the Court finds that RICHD is not a separate legal entity from the County; therefore, RICHD is not suable in federal court. For these reasons, RICHD is dismissed as a party from this suit. Because RICHD and the County are not separate legal entities, the Court construes RICHD's motion for summary judgment as having been made by the County. The County's motion for summary judgment, which is entirely premised on the idea that the County and RICHD are separate legal entities,[3] is DENIED.

---

[3] The County's Motion for Summary Judgment argues that Plaintiffs fail to establish a *prima facie* case of employment discrimination because (1) the County was not their employer; (2) the County did not take an adverse employment action against the Plaintiffs; (3) the County did not adopt a mandatory vaccination policy; and (4) Plaintiffs never communicated their accommodation request to the County. Cnty.'s Mot. Summ. J. 14–17. The County also asserts Plaintiffs failed to exhaust their administrative remedies since the EEOC complaints named RICHD, not the County, as Plaintiffs' employer. *Id.* at 17–18.

## II.    Motions for Summary Judgment

### a.    Legal Standard

Summary judgment "is the put up or shut up moment in a lawsuit." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quotation marks omitted). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the non-movant fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). A party asserting that a fact is genuinely disputed must support its assertion with particular materials in the record. Fed. R. Civ. P. 56(c)(1)(A). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

### b. Analysis

"Title VII [of the Civil Rights Act of 1964] prohibits employers from discriminating against employees . . . based on their religion." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013); *see also* 42 U.S.C. § 2000e–2(a)(1). To establish a *prima facie* case of religious discrimination in a failure-to-accommodate context, "a plaintiff 'must show that [an] observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment.'" *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (quoting *EEOC v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)); *see also EEOC v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996) (outlining the same three requirements). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show that granting any reasonable accommodation would cause an undue hardship. *Porter*, 700 F.3d at 951.

Plaintiffs move for summary judgment on their Title VII claims, arguing both that there can be no dispute that they can establish their *prima facie* cases and that the County does not have sufficient evidence to establish its undue hardship defense. Pls.' Mot. Summ. J. 2. The County moves for summary judgment on its undue hardship defense. RICHD's Mot. Summ. J. 2. Alternatively, it seeks partial summary judgment as to some of the damages Plaintiffs seek. *Id.* at 2–3.

The Court first addresses whether Plaintiffs are entitled to summary judgment on their *prima facie* cases of religious discrimination. Then the Court considers whether either side is entitled to summary judgment as to the County's undue hardship defense. Finally, the Court

addresses whether the County is entitled to partial summary judgment as to Plaintiffs' requests for damages.

### i. *Prima Facie* Case

The parties do not contest that each Plaintiff can establish two elements of the *prima facie* case—that they brought their religious observances to their employer's attention and that the failure to get vaccinated formed the basis of their terminations. The only element in dispute is whether Plaintiffs can show that getting a COVID-19 vaccination conflicted with their religious observances or practices. To establish this element of the *prima facie* case, Plaintiffs must show that "(1) the belief for which protection is sought [is] religious in [the] person's own scheme of things and (2) that it is sincerely held." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 811 (7th Cir. 2025) (alterations in original) (quotation marks omitted). Because Plaintiffs bear the burden to prove their claims, to be granted summary judgment in their favor they must "cite the facts which [they] believe[ ] satisf[y] the[ ] elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). The Court first addresses broad arguments each side makes about the other side's ability to challenge the sincerity and religiosity of Plaintiffs' objections to COVID-19 vaccinations, then addresses the merits of the issue.

### 1. Waiver

Plaintiffs first argue that the County has waived the issue of whether their objections to the vaccination are religious in nature. Pls.' Mot. Summ. J. 32. Plaintiffs assert that the County waived this issue because, during her deposition, Ludwig stated she did not question the religiosity or sincerity of Plaintiffs' beliefs. *Id.*

Statements "not made by Defendant's 30(b)(6) witness . . . cannot be imputed to Defendant." *McCadd v. Kraft Heinz Co.*, No. 22-cv-07096, 2025 WL 660812, at *5 (N.D. Ill. Feb. 28, 2025). Since Plaintiffs provide neither evidence that Ludwig was a 30(b)(6) witness nor any legal support for their argument, the Court is not inclined to find that her statement in a deposition can result in waiver of the County's ability to challenge an element of Plaintiffs' case.

### 2. Adverse Inference

Next, the County argues that it is entitled to an adverse inference because of objections Plaintiffs made to the interrogatories it served on them. *See* RICHD's Resistance Pls.' Mot. Summ. J., ECF No. 54 at 40–43. The County served each Plaintiff with interrogatories requesting identification of:

> (1) their religion, (2) each specific religious belief they claimed to hold which was inapposite to vaccination, (3) the portions of any religious texts or teachings which support the view that those religious beliefs were inapposite to vaccination, (4) their membership in any religious organizations, (5) their membership in any political organizations, (6) their membership in any charitable organizations, (7) any donations they had recently made, (8) the amounts of those donations, (9) each alternative to vaccination they were willing to undertake, (10) any evidence they had displaying the adequacy of that alternative, and (11) a number of matters concerning their requests for damages.

*Id.* at 40. Plaintiffs categorically objected to requests five through eight[4] "on the basis of relevance and proportionality . . . as well as First and Fourteenth Amendment concerns of freedom to associate without undue government prying" and as violating the Illinois Personnel Record Review Act. *See, e.g.*, Sanchez's Answers to Def.'s First Set of Interrogatories 1–2, ECF No. 54-22.[5] The County requests the Court apply the civil

---

[4] The County states that Plaintiffs objected to interrogatories four through eight in the same way, but that is not accurate. The categorical objection and refusal to answer was only for interrogatories five through eight. *Compare, e.g.*, Sanchez's Answers to Def.'s First Set of Interrogatories 9–10, ECF No. 54-22, *with id.* at 10–11.

[5] The County uses a confusing exhibit identification system for the exhibits attached to its response, so for ease of reference the Court simply identifies where those exhibits can be located on the docket.

remedy of adverse inference for an individual's assertion of Fifth Amendment privilege to Plaintiffs' assertion of First Amendment protection to the County's interrogatories and, accordingly, find that honest answers to the interrogatories would reveal each Plaintiff had: (1) no membership in a religious organization "with avowed opposition to accepting one of the COVID-19 vaccines available in October of 2021"; (2) membership in at least one "non-religious, political organization with an anti-vaccination portion of its political platform"; (3) membership in at least "one non-religious, charitable organization with an anti-vaccination mission"; and (4) "at least one donation to a non-religious organization with an anti-vaccination mission."  RICHD's Resistance Pls.' Mot. Summ. J. 41–43.

The County acknowledges that its argument is "unprecedented" but argues there are "good reasons to follow" the law on Fifth Amendment adverse inferences. *Id.* at 41.  The Court will not do so.  First, the interrogatories at issue here broadly asked Plaintiffs to identify groups they are a part of or support, not specifically groups that have anti-vaccination missions.  And second, while the County indicates that it agrees that Plaintiffs' constitutional objections to answering their interrogatories are correct and that is why it did not move to compel answers to the unanswered interrogatories, *id.* at 40–41, it does not cite any caselaw suggesting that Plaintiffs' rights are so broad as to allow them to refuse to answer questions about what groups they belong to if that information is relevant to resolution of their claims.  The Court does not believe they are.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (holding that "discovery that impacts First Amendment associational rights [is] available only after careful consideration of the need for such discovery"); *Grandbouche v. Clancy*, 825 F.2d 1463, 1467 (10th Cir. 1987) ("When [a plaintiff's] associational activities are *directly relevant* to the plaintiff's claim, and disclosure of the plaintiff's affiliations is essential to the fair resolution of

the lawsuit, a trial court may properly compel such disclosure." (quotation marks omitted)).  If the County wanted the information, it should have moved to compel Plaintiffs to answer the questions so the Court could have resolved the issue in discovery.  It cannot remedy that oversight now by arguing for an adverse inference completely unsupported by caselaw.

### 3.  Sincerity and Religious Nature of Each Plaintiff's Beliefs[6]

Getting to the merits, Plaintiffs argue that they have each sufficiently established the religiosity and sincerity of their beliefs under the "very liberal, broad, and expansive test" for whether a belief is sincerely held and religious in nature.[7]  Pls.' Mot. Summ. J. 35.  In contrast, the County asserts Plaintiffs have failed to establish as a matter of law that their opposition to the mandatory vaccination policy resulted from sincerely held religious beliefs.  RICHD's Resistance Pls.' Mot. Summ. J. 37, 44–51.  The County argues that the sincerity and religiosity of Plaintiffs' beliefs remains a genuine issue of material fact which requires further litigation.  *Id.* at 39.

A religious belief is "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *EEOC v. IBP, Inc.*, 824 F. Supp. 147, 150 (C.D. Ill. 1993) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1971)).  The sincerity of that belief "should be measured by the employee's words

---

[6] In their summary judgment motion, Plaintiffs indicate that they will "await Defendants' Response" before providing a fulsome explanation of the evidence supporting the sincerity of Plaintiffs' religious beliefs.  *See* Pls.' Mot. Summ. J. 44.  But as the parties with the burden of proof on the *prima facie* case, Plaintiffs need to show the Court in their summary judgment motion why a trial was unnecessary.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  The County would only need to provide evidence to dispute Plaintiffs' claims if Plaintiffs discharged their burden on summary judgment.  *Cf. Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").  The Court believes it would likely be proper to deny Plaintiffs' summary judgment motion on the basis that they fail to contend, much less demonstrate, that they can meet their burden, but out of an abundance of caution the Court does its best to review the evidence and arguments the parties make.

[7] Plaintiffs do not clearly outline what they believe that test to be.  They include lengthy excerpts from *Adeyeye*, 721 F.3d at 448–53, and *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1011 (7th Cir. 2024), which support their request for a liberal test.

and conduct at the time the conflict arose between the belief and the employment requirement." *Id.* at 151.

In *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1011 (7th Cir. 2024), the Seventh Circuit reiterated that courts should not "undertake to dissect religious beliefs" or "require employees to choose between the binary alternatives of a religious reason and non-religious reason to explain their perspective" for Title VII religious discrimination claims. *Id.* However, the Seventh Circuit explicitly cautioned against "overread[ing] [its] opinion." *Id.* at 1012. *Passarella* was decided at the pleadings stage and the Seventh Circuit noted that in discovery, the employer would "be permitted to develop evidence that the beliefs in question [we]re not 'sincere' or even 'religious.'" *Id.*; *see also McCadd*, 2025 WL 660812, at *3 ("Heeding [*Passarella*'s caution against overreading], the Court finds that the *Passarella* decision is immaterial to the resolution of Defendant's motion for summary judgment."), *appeal filed,* 25-1538 (7th Cir. Mar. 31, 2025);[8] *cf. Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (finding that a district court's reliance "on summary judgment decisions that addressed not the content of complaints but the evidence needed to take a claim to a jury . . . signaled accurately that the court had applied too demanding a standard").

Ultimately, the Seventh Circuit warns courts that "sincerity is a delicate inquiry" and that "[e]mployees carry a low burden to establish that they truly hold certain beliefs." *Kluge*, 150 F.4th at 811. Courts must be cautious not to attempt to define the contours of what beliefs

---

[8] Plaintiffs challenge this application of *Passarella*, Pls.' Mot. Summ. J. 38 ("Plaintiffs fail to see how the broad proclamations of *Passarella* could or should apply any differently at summary judgment."), but the use of different standards for analyzing allegations at the pleading stage than for analyzing evidence at the summary judgment stage is well-established and, again, *Passarella* specifically limits itself.

qualify as religious. *Id.* With this in mind, the Court will now determine whether there is a question of fact as to the religiosity or sincerity of each Plaintiff's beliefs.

### a. Plaintiff Sanchez

Sanchez's request for religious exemption from the vaccination requirement states, in relevant part:

> It is my strongly held religious belief that my body is a temple of the Holy Spirit. . . . The makers of the covid shot have used aborted fetal cells as part of their development. My faith prohibits any participation or benefits from an abortion, no matter when the abortion took place. It is my strong religious belief that these actions are an act of playing God. . . . I feel that my religious beliefs are conflicting with the shot mandate. I am not ok with accepting the covid-19 shot in my body.

Sanchez Request, Pls.' Mot. Summ. J. Ex. 8, ECF No. 48-1 at 27.

Baptized as a baby, Sanchez grew up an active Catholic. Sanchez Suppl. Statement, Pls.' Mot. Summ. J. Ex. 22, ECF No. 48-1 at 29. Although she no longer practices Catholicism, she "still [has] faith and believe[s] in God." *Id.*

She received all of the vaccines required for school. Ludwig's Notes on Sanchez Interview, ECF No. 43-27. During their October 14, 2021, meeting to discuss Sanchez's religious exemption request, Sanchez told Ludwig she received these prior shots because she was young and that it was her parents' decision. *Id.* But she also admitted to receiving all the shots her college required. *Id.* During that same meeting, Ludwig informed Sanchez that the COVID-19 vaccine uses human cells from the 1960s and no new human cells. *See id.* When Ludwig asked Sanchez if this changed her feelings about the vaccine, Sanchez said it did not. *Id.*

Viewing the facts in the light most favorable to the County, there is a genuine dispute of fact as to the sincerity of Sanchez's religious objection to getting the COVID-19 vaccine. A jury could find that Sanchez's decision to get vaccinations when she was college-aged undermines

the sincerity of her religious objection to vaccinations on the basis that her body is a temple and vaccinations are playing God. And construing all inferences in the County's favor, a jury could find that Sanchez's representation to Ludwig that her feelings would not change either suggests that her true objection to the vaccination is not religious in nature or that her belief is not sincere. *Cf. Kluge*, 150 F.4th at 812 (finding a genuine issue of material fact existed as to the sincerity of the plaintiff's objection to using students' chosen first names, which he maintained was "sinful," when he used those names at an awards ceremony").

### b.  Plaintiff Brumbaugh

Brumbaugh's request for religious exemption from the vaccination requirement states, in relevant part:

> It is my strongly held religious belief that causes me to seek a religious exemption from the Covid shot. In Revelation chapter 13 verse 17 states that:
>
>> And that no man might buy or sell, save he that had the mark, or the name of the beast, or the number of his name (p. 1078).
>
> . . . . I firmly believe that cards provided after taking the shot are the mark of the beast, and I fear eternal damnation if I were to accept the mark. My Grandparents raised me with a very religious background and . . . I have been told many times about the Bible stories pertaining to the mark of the beast, the second coming of Christ and the end of times. My Grandparents were very adamant that this would occur in my lifetime and I believe that time has come.
>
> I had the Sars-Cov 2 virus on November 19, 2020. I did become sick enough to require medical intervention and I survived. I feel that God protected me then and he will continue to protect me in these biblical times.

Brumbaugh Request, Pls.' Mot. Summ. J. Ex. 6, ECF No. 48-1 at 25.

The County argues that there is a genuine dispute of fact as to the sincerity of Brumbaugh's belief or whether the vaccination mandate conflicted with her religious beliefs for a few reasons, RICHD's Resistance Pls.' Mot. Summ. J. 46–48, and the Court agrees. First, Brumbaugh admitted in an offer of proof provided in arbitration that she lied to Ludwig about

16

her religious history when they met to discuss Brumbaugh's exemption request in October 2021. *See* Offer of Proof from Deanna Brumbaugh ¶ 6, ECF No. 54-3. This casts doubt on Brumbaugh's character for truthfulness. *See* RICHD's Resistance Pls.' Mot. Summ. J. 48; *cf., e.g.*, *Snyder v. Chi. Transit Auth.*, No. 22 CV 6086, 2025 WL 1725158, at \*4 (N.D. Ill. June 20, 2025) ("While inconsistencies may undermine [the plaintiff's] credibility, whether [the plaintiff] sincerely holds his religious beliefs is ultimately a question of fact more suitable for a factfinder." (citing *Ilona*, 108 F.3d at 1575; *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir. 2002))).

Next, Brumbaugh's objection was primarily that a vaccine card was required to get a job, travel, or attend concerts, but she has not provided any proof that this is true, such that, even assuming her mark-of-the-beast belief is a sincere religious belief, she has not proven as a matter of law that the vaccination mandate would conflict with that belief. In a similar vein, Ludwig offered to allow her to document that she got the vaccine electronically, without a card, but Brumbaugh refused. Ludwig's Notes on Brumbaugh Interview, ECF No. 43-17. A jury could find that this refusal suggests the religious belief was not sincerely held.

Finally, the County points out that Brumbaugh helped vaccinate thousands of people, arguing this challenges her beliefs because "[o]ne would naturally expect that, if a person honestly believed receiving a COVID-19 vaccination card would eternally doom a person's soul, that person would refuse to participate in the mass-condemnation of their fellow people." RICHD's Resistance Pls.' Mot. Summ. J. 47–48. The Court again agrees with the County that, when viewing the evidence in the light most favorable to the non-movant, Brumbaugh's religiosity or sincerity of belief could be called into question by her willingness to vaccinate others.

### c. Plaintiff Allen

Allen's request for religious exemption from the vaccination requirement states, in relevant part:

> I am asking for a sincere religious exemption from any Covid 19 shot or any other shots. I am not specifying which religion, as my religion is just as important as any other.  "Where the Spirit of the Lord is, there is freedom". 2 Corinthians 3:17. I do not wish to compromise my religious beliefs by taking any shots or PCR tests as my body is a temple of the Holy Spirit who is in me.  Just as God said, "I will dwell in them and walk among them; and I will be their God, and they shall be my people.["]

Allen Request, Pls.' Mot. Summ. J. Ex. 9, ECF No. 48-1 at 28.  When she met with Ludwig to discuss her request, Allen refused to identify her religious affiliation.  Ludwig's Notes on Allen Interview, ECF No. 43-13 ("She instantly got indignant and said, I will not tell you my religion so that you can discriminate against it.").  She also stated that "8% of people getting vaccinated will die within 2 weeks and all others will die within 2 years because [the vaccines] all contain graphene oxide which kills people."  *Id.*

The only argument Plaintiffs make in their motion as to why Allen is entitled to summary judgment on this element is that her "request for a religious exemption from being vaccinated against COVID-19 is consistent with the beliefs and practices of an individual who has experienced a Biblical Great Awakening."  Pls.' Mot. Summ. J. 19, 42.  But the only evidence cited in support is an allegation from the Amended Complaint, *id.* at 19 (citing Am. Compl. 19), which was not admitted by the County, RICHD Answer 15.  In their reply, Plaintiffs point to an offer of proof from April 2022 where Allen further explained the religious basis for her objection to vaccination.  *See* Pls.' Reply 43, ECF No. 58 (citing Allen Offer of Proof ¶ 5, Pls.' Reply Ex. 42, ECF No. 58-1 at 26–28).

Plaintiffs have not met their burden to show that no reasonable juror could find against her on this part of her *prima facie* case. A jury could find that Allen's failure to explain the nature of her religious belief at the time of her request along with her pivot to discussing health risks casts doubt on the religious nature of her objection to the vaccination requirement or the sincerity of her religious belief.

### d.  Plaintiff Duhme

Duhme's request for religious exemption from the vaccine requirement states, in relevant part:

> It is important for me to state that taking a vaccine at this point will make me very sick as my antibodies are primed and ready to attack. This makes absolutely no sense that a person with immunity should be forced to take a shot to confer immunity. I am not an anti-vaxer as I have taken all the vaccine regiments that have been needed throughout life . . . .

> There is now so much pressure to take the vaccine that I must turn to God for guidance. In The book of Revelation 13:16-17 it states "Also It causes all, both small and great, both rich and poor, both free and sale to be marked on the right hand or on the forehead so no one can buy or sell unless he has the mark, that is, the name of the beast or the number of its name." As a Christian, I now see that this vaccine that is being forced upon me is the mark of the beast . . . .

Duhme Request, Pls.' Mot. Summ. J. Ex. 7, ECF No. 48-1 at 26. She explains that she views the vaccine as the mark of the beast because she says she cannot fly, receive treatment at a hospital, attend large events, or go to university without getting the vaccine. *Id.* Duhme continues on to say: "[F]or the sake of my immortal soul, I must refuse this vaccine." *Id.*

In Duhme's meeting with Ludwig to discuss her exemption request, Duhme stated that if she "hadn't gotten sick with Covid, [she] probably would have gotten the vaccination." Ludwig's Notes on Duhme Interview, ECF No. 43-22. Ludwig asked for more information about how the passages about the mark of the beast apply to only the COVID-19 vaccine. *Id.* Duhme said it is because the vaccination is required to fly or engage in society. *Id.* When

Ludwig pointed out that it is only required for work because they are a healthcare facility, Duhme said she "should be allowed to be tested and since 'vaccines are waning', everyone should be tested each week." *Id.* Duhme also voiced concerns about needing boosters every six months. *Id.* Ultimately, Duhme reasserted her belief in natural immunity and that she "doesn't need anything else." *Id.*

Again, the Court concludes that Plaintiffs have not met their burden to show that no reasonable jury could find against Duhme on this part of her *prima facie* case. That Duhme admitted she would have gotten the vaccine if she had not gotten sick with COVID-19 clearly creates a dispute of fact as to whether she had a sincere religious objection to getting the vaccination. Moreover, because Plaintiffs have failed to provide evidence supporting that vaccination and/or proof of vaccination was required to engage in society as Duhme claimed, Plaintiffs have failed to establish as a matter of law that the requirement of vaccination actually conflicts with Duhme's religious belief.

### e. Conclusion on Sincerity and Religious Nature of Plaintiffs' Beliefs

Plaintiffs bear the burden to prove their *prima facie* cases. Accordingly, to obtain summary judgment, they needed to demonstrate that all reasonable juries would find that their beliefs were sincerely held, religious in nature, and in conflict with their employer's vaccination requirement. They failed to do so. There is some evidence from which a jury could find that each Plaintiff's objection was not truly based on religious beliefs or was based on religious beliefs that Plaintiffs do not sincerely hold. The jury should decide this issue. The Court denies Plaintiffs' motion for summary judgment on their *prima facie* case.

## ii. Undue Hardship of Accommodation on the County

Once a plaintiff successfully establishes a *prima facie* case of discrimination, "the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter*, 700 F.3d at 951. "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. . . . [C]ourts must apply the [undue hardship] test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer." *Groff v. DeJoy*, 600 U.S. 447, 470–71 (2023) (quotation marks omitted). This inquiry into whether an accommodation poses an undue hardship is a factual one. *Kluge*, 150 F.4th at 803 ("Although the Court declined to offer a bright-line rule . . . it emphasized that the inquiry is fact specific."). "Any impact of the accommodation, including effects on coworkers, must affect the overall business." *Id.* A defendant must establish an objective undue hardship, rather than a subjectively perceived one. *Id.* at 808. Ultimately, an employer cannot "merely offer a good-faith—yet mistaken—reason for taking an adverse employment action" when defending a failure-to-accommodate claim. *Id.* at 807.

Both the County and Plaintiffs move for summary judgment on the affirmative defense of undue hardship. "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The party moving for summary judgment has an initial burden "to inform the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). But how the party discharges that burden depends on whether the party has the ultimate burden of proof on a

claim. *See id.* When the movant bears the ultimate burden of proof on a claim, it "must lay out the elements of the claim, cite the facts which it believes satisf[y] the[ ] elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71*, 778 F.3d at 601. When the movant does not bear the ultimate burden of proof on a claim, it can satisfy its initial burden by pointing to an absence of evidence to support the non-movant's case. *Modrowski*, 712 F.3d at 1168. If the movant first discharges its burden, the non-movant must "respond . . . by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

The County bears the burden of proof as to its undue hardship defense. *See Porter*, 700 F.3d at 951. To grant the County's motion on this issue, the Court must conclude that a reasonable jury would find that no accommodation could be made without undue hardship. Conversely, to grant Plaintiffs' motion, the Court must conclude that a reasonable jury could never find that no accommodation could be made without undue hardship. Neither conclusion is warranted.

The County asserts that four distinct hardships would have been imposed by granting Plaintiffs' requested exemptions: (1) "undermin[ing] [RICHD's] organizational objectives in promoting the public health of the County and fighting to minimize the impact of the COVID-19 pandemic through mass vaccination;" (2) "increas[ing] the risk of reputational harm to [RICHD];" (3) preventing RICHD from "adhering to industry best-practices;" and (4) "increas[ing] the risk of spreading COVID-19 amongst [RICHD] or patients of [RICHD], potentially leading to shutdowns of [RICHD] operations or increased workload in fighting the pandemic at [RICHD]." RICHD's Mot. Summ. J. 14–15.

The Court will first address a few broad arguments Plaintiffs make as to why the County cannot establish its undue hardship defense, then address the arguments specific to each hardship. Plaintiffs first assert that Ludwig's deposition testimony should preclude the County from relying on reputational, mission-based, or industry-practice-based concerns because she testified that the only reason for denying Plaintiffs' exemption requests was safety concerns. *See, e.g.*, Pls.' Resp. RICHD's Mot. Summ. J. 34–35, ECF No. 50; Pls.' Mot. Summ. J. 56–58. They rely on *McCadd* to support their argument. *See* Pls.' Mot. Summ. J. 56–59. The *McCadd* court took issue with a *plaintiff* changing her position between the discovery and motions stages. *McCadd*, 2025 WL 660812, at *5 ("Plaintiff cannot hide behind Christian tenants that are irrelevant to her true objection to the COVID-19 vaccine, and that were not brought to Defendant's attention at the time of her exemption request, or any other time throughout her employment, in claiming religious discrimination."). They argue that the County too should not be allowed "to rely on alleged undue hardship factors that were never communicated to Plaintiffs at any time." Pls.' Mot. Summ. J. 60. But part of a plaintiff's *prima facie* case is that she made the religious nature of her need for accommodation known to her employer. *See Adeyeye*, 721 F.3d at 450 ("[A]n employee who wants to invoke an employer's duty to accommodate his religion under Title VII must give the employer fair notice of his need for an accommodation and the religious nature of the conflict."). Plaintiffs cite no law for the proposition that an employer has a similar duty of notice to an employee. Moreover, as *McCadd* also notes, a statement by a non-30(b)(6) witness like Ludwig cannot bind a defendant. *See McCadd*, 2025 WL 660812, at *5.

Plaintiffs are essentially arguing that a defendant is limited in litigation to the reasoning provided to an employee for denying an accommodation at the time it was denied. But this

makes little sense if an employer is attempting to prove that any accommodation would impose

an undue hardship, *see Porter*, 700 F.3d at 951, or as some other courts put it, to prove that "no

accommodation could have been made without undue hardship," *Toledo v. Nobel-Sysco, Inc.*,

892 F.2d 1481, 1490 (10th Cir. 1989). Indeed, the test articulated by the Supreme Court in *Groff*

requires "tak[ing] into account all relevant factors in the case at hand," *Groff*, 600 U.S. at 447,

not merely taking into consideration the factors provided by the decisionmaker at the time.

Plaintiffs' argument sounds in pretext. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th

Cir. 2025) ("One can reasonably infer pretext from an employer's shifting or inconsistent

explanations for the challenged employment decision."). Evidence of pretext could be relevant

to a reasonable accommodation claim to the extent it undermines the employer's assertion that it

could not accommodate the employee without undue hardship. *Cf. Mlsna v. Union Pac. R.R.*

*Co.*, 975 F.3d 629, 638 (7th Cir. 2020) (explaining that "[w]hile evidence of pretext may be

relevant in [ADA failure-to-accommodate claims], a pretext analysis need not be part of the

reasonable accommodation evaluation"). But even in employment discrimination cases where

evidence of pretext is highly relevant, the Court is not aware of any principle that *precludes* an

employer from making a new argument during litigation. Instead, showing that the employer has

provided a different reason in litigation is simply relevant to the ultimate factual question which

is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's"

protected characteristic "caused the . . . adverse employment action" of which she complains.

*See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

    Second, to the extent that Defendants rely on their public health expert, Dr. Asfour, to

support that allowing Plaintiffs' exemptions would cause an undue hardship, Plaintiffs argue that

"Dr. Asfour's opinions were not specific to any Plaintiff, and the studies cited by Dr. Asfour to

support his opinions . . . all post-date the decisions [to deny Plaintiffs' requests] on October 15, 2021 [sic] and November 1, 2021."  Pls.' Resp. RICHD's Mot. Summ. J. 36.  Plaintiffs made similar specificity arguments in their motion to exclude Dr. Asfour's testimony and the Court rejected them by explaining that the purpose of his testimony is to provide context and public health information, not to analyze each Plaintiff specifically.  May 12, 2025 Order 15–16, ECF No. 42 ("Because RICHD uses this expert opinion to bolster its argument that providing the exemptions would have created an undue burden, a part of the factfinder's role will be to understand the pandemic's impact on employers.  Dr. Asfour's opinion is not too vague to provide this background.").  Plaintiffs' other argument—that Dr. Asfour relies on studies that postdate when the exemption requests were denied—is, at best, underdeveloped.  While true that courts have confined the undue hardship analysis to information available to an employer at the time the decision was made, *see, e.g.*, *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152 (D. Or. 2024); *Efimoff v. Port of Seattle*, No. 2:23-cv-01307-BAT, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024), Plaintiffs do not identify which portions of Dr. Asfour's report or deposition testimony it finds objectionable on this basis.  And as Plaintiffs seem to acknowledge, not all of Dr. Asfour's testimony was based on studies that postdate fall 2021.  They, for example, point out that Dr. Asfour testified about the scientific consensus on the COVID-19 vaccine in September 2021.  *See* Pls.' Resp. RICHD's Mot. Summ. J. 46–47.  The Court will not develop and craft a specific argument for Plaintiffs, though it will attempt to cabin its consideration to evidence that was available at the time Plaintiffs requested exemptions from the vaccination requirement.

Third, Plaintiffs argue that the County "subverts the proper analysis and misstates who bears the burden of accommodation in a Title VII case."  *Id.* at 36 (quotation marks omitted).

25

Plaintiffs state that "[t]he proper focus should be on accommodating the religious practices or beliefs of the Plaintiffs, not on accommodating the Defendant," which they argue the County has failed to do because, according to Plaintiffs, the County discusses alleged undue burdens from its own perspective, "not the proper perspective of whether Plaintiffs could have been accommodated." *Id.* at 36–38. Plaintiffs are correct that the County focuses on the burden of accommodation from its own perspective—that is the entire premise of the undue hardship defense. *See, e.g.*, *Kluge*, 150 F.4th at 802 ("[A]n employer must accommodate its employees' religious beliefs and practices. It is excused from providing an accommodation only if doing so imposes an undue hardship *on its business*." (quotation marks omitted) (emphasis added)). Any alleged hardship must be, by definition of the affirmative defense, on the employer. Thus, the County must focus on the impact of the requested accommodation on itself, not on Plaintiffs. However, to the extent that Plaintiffs are tying this argument to the idea that the County needed to consider other possible accommodations for each Plaintiffs, *see* Pls.' Resp. RICHD's Mot. Summ. J. 38; Pls.' Mot. Summ. J. 67–78, the point is well-taken and will be addressed below.

### 1. Undermining RICHD's Mission & Increasing the Risk of Reputational Harm

The Court will first consider the County's assertion that granting Plaintiffs' exemption requests "would have undermined [RICHD's] organizational objectives," RICHD's Mot. Summ. J. 15, and would "increase[ ] the risk of reputational harm to [RICHD]," *id.* Both the County's asserted hardship of burden on its mission, *see id.* at 12 (arguing that "[a]ny unvaccinated employee of a public health organization pushing for increased vaccination in the communities it serves could potentially undermine the mission of that public health organization by providing information, or being an example, inconsistent with the messaging of the organization"), and the

evidence it cites in support, *see* Asfour Dep. 64:24–66:6, ECF No. 45-50 (testifying that there is a "reputational risk" if a janitor for the World Health Organization reported to community members that they did not get the flu vaccine when the Organization's mandate was promoting flu vaccination), seem, to the Court, inextricably intertwined with the County's alleged hardship of reputational harm. As such, the Court will address both the burden on mission[9] and reputational harm hardships together.

The County's public health expert, Dr. Asfour, opined that there is "a reputational cost" or "a reputational risk" to a public health agency recommending vaccines but allowing some of its staff to be unvaccinated. *Id.* at 102:15–19[10]; *see also id.* at 64:24–66:6. So far as the Court can tell, the only other evidence the County provides pointing to a reputational risk resulting from granting exemptions is a complaint it received from community members John and Angela Moody. *See* Notes from Phone Call John & Angela Moody, ECF No. 55-1. Duhme went to the Moody home in October 2021 to conduct a well-water test and, while there, "[told] the Moody family that she didn't believe that she needed to be vaccinated because she previously had COVID and still had antibodies." *Id.* The Moody family "was concerned that an unvaccinated health department employee came into their home without a mask," "couldn't believe that a health department employee would not be following COVID-19 safety protocols," was "worried

---

[9] When an employer asserts an undue hardship claim based on its purported mission, the employer must provide "proof of its mission pre-dating [the plaintiff's] request for accommodation." *Kluge*, 150 F.4th at 805. Once an employer successfully establishes that its mission preceded the accommodation request, the employer must still produce evidence that an accommodation would have created "excessive or unjustifiable hardship on its mission." *Id.* (quotation marks omitted). RICHD's proffered mission was to "prevent[ ] disease, promote[ ] wellness of mind and body, protect[ ] public health and prepare[ ] for emergencies." RICHD's Mot. Summ. J. 15. While the Court recognizes that a public health department works towards the promotion of public health, *see* 55 ILCS 5/5-25001–26, it is dubious that the County met its burden of proof. But the Court refrains from ruling on this matter because, as discussed above, the County certainly fails to establish that Plaintiffs' accommodations would impose an undue burden.

[10] Plaintiffs attempt to "dispute" or "deny" some of the County's facts that are based on Dr. Asfour's testimony by making legal arguments such as that Dr. Asfour's testimony cannot trump the exemption policy. *See, e.g.*, Pls.' Resp. RICHD's Mot. Summ. J. 18–23, 25–26. The Court "disregards legal arguments in the statement of facts." *Berkeley*IEOR v. Teradata Ops., Inc.*, 719 F. Supp. 3d 842, 851 (N.D. Ill. 2024).

that asking [Duhme] to put on a mask would negatively affect their water report," and "[tried] to get her out of the house as quickly as possible." *Id.* They reported that they did not "consider her behavior to be professional." *Id.*

When viewing the evidence in the light most favorable to Plaintiffs, the Court is unconvinced that Dr. Asfour's testimony—which does not quantify an amount of reputational risk—and one complaint from a family—which could be interpreted as a comment on Duhme's professionalism rather than her unvaccinated status—means the County has established that either the burden on its mission or the reputational cost constitute an undue hardship as a matter of law. But when viewing the evidence in the light most favorable to the County, the Court concludes that a jury *could* find the burden on organizational mission and reputational risk to be or to at least contribute to an undue hardship based on that evidence. Thus, neither party is entitled to summary judgment on these alleged hardships.

## 2. Deviating from Industry Standards

Next, the County asserts that granting Plaintiffs' exemption requests "would result [ ] in the Department not adhering to industry best-practices." RICHD's Mot. Summ. J. 15. It asserts that "Dr. Asfour's ultimate conclusion was, in essence, that vaccination of staff was the standard of care for both medical providers and public health entities," and so allowing employees to work in a public health organization without vaccination would "prevent [RICHD] from adhering to industry best-practices." *Id.* at 17. But the County does not cite to where this appears in the record, nor does this proffered information appear anywhere in its facts section. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). As such, the County has presented no material facts in support of its claim. Because there is no evidence from which a jury could find that the County suffered an

28

undue hardship based on its inability to adhere to industry practices, Plaintiffs are entitled to summary judgment as to this alleged hardship and the County is not.

### 3.  Increasing the Risk of Spreading COVID-19

Finally, the Court considers the County's argument that granting Plaintiffs' exemption requests would "increase[ ] the risk of spreading COVID-19 amongst the Department or patients of the Department, potentially leading to shutdowns of Department operations or increased workload in fighting the pandemic at the Department."  RICHD's Mot. Summ. J. 17.  COVID-19 was declared a public health emergency in Illinois in March of 2020 and, by fall of 2021, vaccines were considered the safest and best treatment strategy by public health experts.  *See* Aug. 26, 2021 Executive Order 1–2, ECF No. 45-1.  In October of 2021, either eleven or eighteen Rock Island County residents died from COVID-19 related causes.[11]

Dr. Asfour opined that vaccination was a better prevention strategy than weekly testing because "testing is behind the eight ball"—a person could contract COVID-19 one day after testing negative, but it would not be identified for six days.  Asfour Dep. 59:15–60:2.  He also opined that, around October 2021, the public health community was "hoping that for most people that COVID 19 vaccination would result in . . . significantly less transmission" because "the amount of virus that somebody was shedding . . . would be much lower."  *Id.* 60:3–12.[12]

---

[11] The County alleges that at least eighteen people died in Rock Island County in October of 2021, and cites to the October 4, 2021 and October 27, 2021 RICHD reports in support.  RICHD's Mot. Summ. J. ¶ 42 (citing Oct. 4, 2021 RICHD COVID-19 Rep., ECF No. 45-41; Oct. 27, 2021 RICHD COVID-19 Rep., ECF No. 45-48).  Presumably, the County is taking the total deaths listed in the October 27 report and subtracting the total deaths listed in the October 4 report to get to 18 deaths.  But the October reports attached to the summary judgment motion report eleven "additional" deaths in October.  Oct. 6, 2021 RICHD COVID-19 Rep. 1, ECF No. 45-42 (reporting two additional deaths); Oct. 15, 2021 RICHD COVID-19 Rep. 1, ECF No. 45-44 (reporting one additional death); Oct. 18, 2022 RICHD COVID-19 Rep. 1, ECF No. 45-45 (reporting three additional deaths); Oct. 22, 2021 RICHD COVID-19 Rep. 1, ECF No. 45-46 (reporting three additional deaths); Oct. 25, 2021 RICHD COVID-19 Rep. 1, ECF No. 45-47 (reporting two additional deaths).

[12] Plaintiffs deny that testing was inadequate for a laundry list of reasons, all of which constitute legal argument.  *See* Pls.' Resp. RICHD's Mot. Summ. J. 18–25.  Because Plaintiffs failed to present a factual basis for denying the fact, the Court treats this fact as undisputed.

29

RICHD's leadership believed that, based on science available at the time, each additional vaccinated person improved the efficacy of all vaccines, Ludwig Dep. 198:10–25, ECF No. 45-5,[13] and an optimal community vaccination rate is typically around ninety-eight percent, Asfour Dep. 56:8–14.[14] Unvaccinated staff increased the risk that community members receiving services from RICHD would contract COVID-19 after their interactions. *Id.* at 37:4–38:15.[15] According to the County, the risk of spreading COVID-19 was particularly prescient with all four Plaintiffs because each Plaintiff's role was "public-facing . . . where they regularly interact[ed] with constituents face-to-face." RICHD's Mot. Summ. J. 18.

But questions of material fact remain as to the extent of in-person interactions each Plaintiff's role truly required and, thus, how much risk allowing each Plaintiff to remain unvaccinated posed. Sanchez, as a nutritionist with the women, infants, and children program ("WIC"), regularly weighed children, advised pregnant women, and provided other in-person services. Ludwig Dep. 30:15–31:11. But Plaintiffs argue that, at the time in question, RICHD offered curbside services; WIC appointments were done over the phone; when WIC employees went outside to give participants their benefit cards, they wore masks; and not all WIC

---

[13] The Court uses the page numbers included on the deposition transcript, not the numbers generated by CM/ECF. Plaintiffs argue this fact is undisputed but immaterial because it was subject to a continuing objection that it called for a medical conclusion. Pls.' Resp. RICHD's Mot. Summ. J. 29. As best the Court can tell, Plaintiffs are actually trying to argue this fact is inadmissible because Ludwig is not an expert witness. *See* Fed. R. Evid. 701–705. But the Court disagrees. Ludwig is explaining from what type of sources she gathered the information vital to her decision-making process and her understanding of a concept discussed in those materials. Ludwig Dep. 198:10–25. If this can even be considered testimony in the form of an opinion, it is clear that it is not based on "scientific, technical, or other specialized knowledge" such that Ludwig can testify to it as a lay witness. *See* Fed. R. Evid. 701(c).

[14] Plaintiffs dispute the ninety-eight percent figure because Dr. Asfour's testimony was based on his experience with the flu vaccine. *See* Pls.' Resp. RICHD's Mot. Summ. J. 26. But the Court reads Dr. Asfour's reference to the flu vaccine to relate to his opinion that "if some people see exemptions being granted, then they will want exemptions being granted." Asfour Dep. 56:14–20. The Court does not rely on that testimony.

[15] Plaintiffs again deny this fact for many reasons, all of which are legal arguments. Pls.' Resp. RICHD's Mot. Summ. J. 18–25. The Court treats this fact as undisputed but points out that the County has not cited to the correct portion of its evidence. The County indicated that pages 35 to 36 and 102 of Asfour's deposition supported this fact, RICHD's Mot. Summ. J. ¶ 57 (citing Asfour Dep. 35:6–36:10, 102:4–24), but the Court located the information in a different portion of the deposition.

employees needed to perform these participant-contact tasks.  Sanchez Aff. ¶¶ 4–10, Mot. Leave

File Excess Pages Ex. 58, ECF No. 49-3 at 1–7.  Thus, a genuine dispute of material fact remains

as to which, if any, aspects of Sanchez's role actually required public contact at the time.  When

viewing the evidence in the light most favorable to the County, a reasonable juror could find that

the risks of working closely with children and pregnant woman while unvaccinated during a

pandemic constituted an undue hardship.  Alternatively, when viewing the evidence in the light

most favorable to Plaintiffs, a reasonable juror could find that the remote nature of WIC

appointments and limited face-to-face interaction during the time in question means that

allowing Sanchez an exemption from the vaccination requirement would not pose an undue

hardship on the County.  As such, both parties' motions for summary judgment fail.

The extent of in-person contact required by Brumbaugh and Duhme's position as

sanitarians likewise remains a genuine dispute of material fact best left to the jury.  The County

asserts that their roles "required regular, daily, in-person contact with representatives of the

locations being inspected out in the field" and that both Plaintiffs "regularly performed health

and safety inspections at businesses and residences across Rock Island County."  RICHD's Mot.

Summ. J. ¶¶ 19–20 (citing Ludwig Dep. 34:1–35:6, 195:19–196:5).  As discussed earlier, the

County received a citizen complaint about Duhme's conduct and failure to wear a mask while in

their home performing a water test despite her unvaccinated status.  In contrast, Plaintiffs provide

evidence that, in the fall of 2021, much of their public-facing work was either performed

outdoors or while wearing a mask and social distancing.  Brumbaugh Aff. ¶¶ 19–20, Mot. Leave

File Excess Pages Ex. 59, ECF No. 49-3 at 8–11 ("[By] September through October 15, 2021,

when I was suspended, I had very little contact with the general public.  My work out in the

public was generally confined or limited to outside work which did not require any close in-

person contact."); Duhme Aff. ¶¶ 15–16, 20–23, Mot. Leave File Excess Pages Ex. 60, ECF No.
49-3 at 12–19.  Once again, when viewing the evidence in the light most favorable to the County,
a reasonable juror could find that the risks of unvaccinated employees entering the public's
homes and businesses and engaging with the public would constitute an undue hardship.
Alternatively, when viewing the evidence in the light most favorable to Plaintiffs, a reasonable
juror could find that the limited face-to-face, indoors contact during the time in question means
that allowing Brumbaugh and Duhme exemptions from the vaccination requirement would not
impose an undue hardship on the County.  Because a genuine dispute of material fact exists,
summary judgment for either the County or Plaintiffs is inappropriate.

A genuine dispute of material fact also remains as to the nature of the risk posed by
Allen's role as a program specialist for environmental health, Ludwig Dep. 41:10–13.  Ludwig
testified that Allen was "basically [environmental health's] receptionist" and "clerical support."
*Id.* at 41:19–20.  She worked in an office by herself.  *Id.* at 43:17–21.  Because her "office [was]
up front," Allen "greet[ed] people on a daily basis."  *Id.* at 42:4–7.  During the relevant time-
period, however, "[t]here was a Plexiglass in the window of [Allen's] office."  *Id.* at 42:9–13.
Though the County acknowledges "the risk of [Allen] spreading COVID-19 through public
interactions was less because of the additional controls that could be implemented, the risk was
still present as she nonetheless engaged in a multitude of in-person interactions with the public."
RICHD's Mot. Summ. J. 19.  The only public interaction the Court is aware of, however, is that
she gave "out test kits for people coming in for environmental health to check out their water
samples" either through a door or a window.  Ludwig Dep. 44:5–15.  Allen provided an affidavit
stating that she could go "weeks at a time" without coming into contact with a member of the
public.  Allen Aff. ¶ 13, Mot. Leave File Excess Pages Ex. 61, ECF No. 49-3 at 20–23.  The

County has certainly not established that accommodating Allen's religious objection would have caused an undue hardship as a matter of law because of the risk of spreading COVID-19.  Even though the evidence that Allen specifically posed a risk of spreading COVID-19 is rather thin, as there remain issues of fact as to Allen's *prima facie* case and the potential reputational risk injury, the Court finds that summary judgment is unwarranted for Plaintiffs too.

While the County points to many cases in which courts have found "that the heightened risk of exposing fellow employees to COVID-19 infection and attendant burdens that a COVID-19 outbreak would place on the employer warranted a denial of the employee's requested exemption to a vaccination policy," RICHD's Mot. Summ. J. 20, the present case is distinguishable from those cases in significant ways.  For some of the cases, the employers clearly established that the individuals' roles required in-person work with high-risk individuals. *See, e.g.*, *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397–98  (1st Cir. 2025) (holding a registered nurse who worked in the Intensive Care Unit's religious exemption request from the COVID-19 vaccine would have been an undue hardship because she worked directly with patients and families daily); *Kizer v. St. Jude Child.'s Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856, at *3–8 (6th Cir. Nov. 18, 2024) (holding that granting an employee's religious COVID-19 vaccine exemption request would constitute an undue hardship because, after investigation, the employer determined the role must be in-person and, because of the nature of the employer's work as a hospital for children with cancer, patients were especially vulnerable to COVID-19 compared to the general public).  The plaintiffs in many of the cases cited also raised quite different challenges than the Plaintiffs in this case.  *See, e.g.*, *Melino*, 127 F.4th at 397 (finding in favor of the employer when the plaintiff did not dispute her employer "could establish undue hardship if the vaccines worked," she only challenged the sufficiency of evidence presented that vaccines

successfully prevented transmission of COVID-19 (alterations and quotation marks omitted));

*Wise v. Child.'s Hosp. Med. Ctr. Akron*, No. 24-3674, 2025 WL 1392209, at *3–4 (6th Cir. May

14, 2025) (finding in favor of the employer when it offered testing as an alternative for

unvaccinated employees, but the plaintiff sought an exemption from both testing and

vaccination); *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *2 (3rd Cir.

Apr. 10, 2025) (finding in favor of the employer when the plaintiff's only challenge to the

employer's undue hardship defense was that the employer granted other employees' religious

exemption requests without presenting information on those employees' roles or requested

accommodations); *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025) (noting

that the plaintiff's only argument against the employer's undue hardship defense was that the

employer failed to "proffer[ ] admissible evidence showing that the vaccine actually protects

against the transmission of COVID-19" because "if the vaccine does not reduce the likelihood of

COVID-19 transmission . . . then [the employer] suffers no undue hardship by granting [the

plaintiff] an exemption").  Finally, *Bordeaux v. Lions Gate Entertainment, Inc.*, No. 23-4340,

2025 WL 655065, at *1–2 (9th Cir. Feb. 28, 2025), is distinguishable because the employer

established (1) the employee must be present for work to proceed and (2) if the plaintiff came to

work with COVID-19 or needed to isolate due to a  COVID-19 exposure, the employer would

lose, at best, millions of dollars.  While the principles in these cases are helpful, they do not

suggest that the County is entitled to summary judgment on its undue hardship defense.

   In support of their motion for summary judgment, Plaintiffs raise two legal arguments.

First, Plaintiffs assert that the County fails to demonstrate that no form of accommodation[16]

---

[16] Plaintiffs also seem to support this argument by encouraging the Court to apply a standard like the Americans with Disabilities Act's ("ADA") mandatory interactive process.  *See* Pls.' Mot. Summ. J. 84–85.  Plaintiffs concede many courts have rejected this application but argue "that does not completely absolve [the County] of some duty to

would have permitted Plaintiffs to work while unvaccinated without increasing the risk of COVID-19 transmission, and that the County's failure to "consider . . . Plaintiffs individually" is a failure to consider whether there were alternate accommodations available that would not cause an undue burden.  Pls.' Mot. Summ. J. 67–78.  The Court agrees that because "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation," an employer must also "consider[ ] . . . other options."  *Groff*, 600 U.S. at 472.  But this does not impose a requirement that the County *prove* that it considered other options.  To survive Plaintiffs' summary judgment motion, the County must create a genuine dispute of fact as to whether "any reasonable accommodation would result in undue hardship."  *Porter*, 700 F.3d at 951.  And the County contends that "no accommodation which would not impose an undue hardship on the Department's operations" existed because allowing Plaintiffs "to continue in the[ir] job responsibilities unvaccinated" would "work an undue hardship on its operations."  RICHD's Resistance Pls.' Mot. Summ. J. 63–64.  The question of whether alternate accommodations were available, then, seems to come down to the same issue discussed above—whether the County can prove that each Plaintiff being unvaccinated posed an unacceptably high risk of spreading COVID-19.

Second, Plaintiffs argue that any heightened risk of COVID-19 transmission is purely hypothetical.  Pls.' Mot. Summ. J. 5; *see also* Pls.' Resp. RICHD's Mot. Summ. J. 45.  Plaintiffs argue that "if every other . . . employee was fully vaccinated (approximately 92%) and . . . all Dr.

---

consider accommodations."  *Id.*  The Court does not agree with applying the ADA's interactive process requirement to Title VII religious discrimination claims; however, the Court recognizes that whether an employer made an informed decision after sufficient investigation, including gathering information from employees, could be relevant to whether the employer meets its burden to show that no accommodation was available.  *See, e.g.*, *Kizer*, 2024 WL 4816856, at *4–5.

Asfour can muster is broad generalizations couched in such terms as 'could have' and 'may have,' [the County] has shown nothing more than a speculative risk of endangering both organization staff and members of the public." Pls.' Resp. RICHD's Mot. Summ. J. 45.  The Court must first point out that Plaintiffs' argument is based on an unsupported premise that ninety-two percent of RICHD's employees were fully vaccinated.  In any case, Plaintiffs' argument that the risk of danger to the public is a "speculative" one must fail—an abundance of caselaw demonstrates that unrealized safety concerns are sufficient to establish an undue hardship defense in a Title VII failure-to-accommodate case. *See, e.g.*, *Wise*, 2025 WL 1392209, at *4 ("It is not required that an employer show a materialized harm in order to meet the undue hardship standard . . . Title VII does not require that safety be subordinated to the religious beliefs of an employee." (quotation marks omitted)); *Bordeaux*, 2025 WL 655065, at *2 ("An employer need not establish that an adverse health or safety event is *certain* to result from an accommodation to establish undue hardship under Title VII." (emphasis in original)); *Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 759–60 (E.D.N.Y. 1998), *aff'd mem.*, 189 F.3d 461 (2d Cir. 1999) (holding that an employee's failure to wear a hard hat increases risk of injury).  If the Court were to accept Plaintiffs' argument, all safety measures would qualify as "speculative" until someone at each workplace suffers a specific harm a safety measure had been intended to remedy.  This is unsustainable.

For these reasons, both Plaintiffs' and the County's motions for summary judgment on the issue of undue hardship are denied.

### iii.  Damages

Each Plaintiff requests "compensation to make her whole, including prejudgment interest on her backpay award, remuneration for loss of enjoyment of life, severe physical and emotional

pain and suffering, embarrassment, humiliation and anxiety in the past, present and future." Am. Compl. 8, 16, 22, 28–29. Each Plaintiff requests the Court award them at least $75,000.00, plus associated costs and fees, as well as any other appropriate relief. *Id.* Sanchez also requests "reimbursement of the deduction for unemployment compensation as Illinois does not provide a wage loss damages offset for unemployment benefits received in wrongful termination claims." *Id.* at 8–9. Sanchez and Duhme request punitive damages for intentional religious discrimination. *Id.* at 9, 29. Brumbaugh requests "compensation for unreimbursed medical bills still pending from the time she was off work and should have been provided medical coverage."[17] *Id.* at 16.

The County moves for partial summary judgment on Plaintiffs' requests for (1) punitive damages and (2) prejudgment interest and reimbursement for medical bills and unemployment withholding, and (3) requests the Court set a $50,000.00 per Plaintiff cap on damages. RICHD's Mot. Summ. J. 21–26.

### 1. Punitive Damages

The County requests summary judgment on Plaintiffs' request for punitive damages because it argues that punitive damages cannot be issued against the government, a government agency, or a political subdivision. RICHD's Mot. Summ. J. 25. Plaintiffs concede that punitive damages cannot be awarded against a government or government agencies under 42 U.S.C. § 1981(a)(b)(1), Pls.' Resp. RICHD's Mot. Summ. J. 58, and the Court agrees. *See* 42 U.S.C. § 1981a(b)(1) (allowing recovery of punitive damages "against a respondent other than a government, government agency or political subdivision" (parentheses omitted)).

---

[17] Plaintiffs assert that Duhme and Allen make claims for damages for unreimbursed medical expenses, Pls.' Resp. RICHD's Mot. Summ. J. 61, but they are citing to statements in affidavits, not the Amended Complaint. To the extent it is permissible for them to request such damages without including that request in the Amended Complaint, the same analysis applies to their request as the Court applies to Brumbaugh's request

Accordingly, the Court grants the County's motion for summary judgment on Plaintiffs' claims for punitive damages.

### 2. Prejudgment Interest and Reimbursement

As a result of their arbitration proceedings, each Plaintiff was reinstated with back pay and benefits.[18]  Arbitration Award 42, Pls.' Resp. Cnty.'s Mot. Summ. J. Ex. 47, ECF No. 44-2. Now, each Plaintiff requests "compensation to make her whole, including prejudgment interest on her backpay award."  Am. Compl. 8, 16, 22, 28–29.  In making this request, Plaintiffs assert they "ha[ve] suffered damages that have not been or could not have been remedied by the union/administrative process," making them "entitled to fair and just compensation" in their requested forms.  *Id.*  Plaintiff Sanchez also requests reimbursement for unemployment benefit withholding, *id.* at 8–9, and Brumbaugh requests reimbursement for pending medical bills which would have otherwise been covered by insurance through her employment, *id.* at 16.

The County argues that awarding prejudgment interest on Plaintiffs' backpay awards and damages for unemployment benefit withholding and unreimbursed bills "would be inappropriate because they are included in the scope of their arbitration award."  RICHD's Mot. Summ. J. 22. The County argues that these requested damages are "essentially[] alleged insufficiencies in [its] satisfaction of the arbitration award" and, accordingly, the requests "are within the jurisdiction of the arbitrator who resolved the arbitration complaint."  *Id.* at 22–23.

The Illinois Public Labor Relations Act requires that arbitration provisions in collective bargaining agreements be subject to the Illinois Uniform Arbitration Act.  5 ILCS 315/8.   Under

---

[18] Plaintiffs Brumbaugh, Duhme, and Sanchez were "reinstated with full back pay and benefits" while Allen was determined to have been suspended for just cause, only entitling her to reinstatement, "back pay and benefits for the time of her termination."  Arbitration Award 42, Pls.' Resp. Cnty.'s Mot. Summ. J. Ex. 47, ECF No. 44-2.  Plaintiffs argue that they were not awarded "full" back pay and benefits and that they "do not waive their legal argument that the Arbitration Award did not make them whole."  Pls.' Resp. RICHD's Mot. Summ. J. 11 (quotation marks omitted).  But the Court uses "full back pay and benefits" for Brumbaugh, Duhme, and Sanchez because that is the exact language of the arbitration award.  Arbitration Award 42.

the Illinois Uniform Arbitration Act, a court can modify, confirm, or correct an award if an

application is made within ninety days after delivery of a copy of the award and where: "(1)

[t]here was an evident miscalculation of figures or an evident mistake in the description of any

person, thing or property referred to in the award; (2) [t]he arbitrators have awarded upon a

matter not submitted to them and the award may be corrected without affecting the merits of the

decision upon the issues submitted; or (3) [t]he award is imperfect in a matter of form, not

affecting the merits of the controversy." 710 ILCS 5/13(a)(1)–(3). Significantly, "courts will

not vacate an arbitration award for mere 'errors in judgment or mistakes of law' unless 'gross

errors of judgment in law or a gross mistake of fact' are 'apparent upon the face of the award.'"

*Bankers Life & Cas. Ins. Co. v. CBRE, Inc.*, 830 F.3d 729, 732 (7th Cir. 2016) (quoting *Garver*

*v. Ferguson*, 389 N.E.2d 1181, 1183–84 (Ill. 1979)).

   In support of their request for prejudgment interest on the backpay award, Plaintiffs cite

to *Frey v. Hotel Coleman*, 903 F.3d 671, 682 (7th Cir. 2018), asserting that "the general

principles for prejudgment interest under Title VII should still apply here, particularly where

Plaintiffs waited an entire year before their Arbitration Award." Pls.' Resp. RICHD's Mot.

Summ. J. 58–59. It is true *Frey* states that "the goal [of Title VII] is to make a plaintiff whole"

and that "[p]rejudgment interest restores a plaintiff to the position she would have been in but for

the violation," *Frey*, 903 F.3d at 682. But *Frey* says nothing about whether the Court can award

prejudgment interest on a judgment it did not enter.

   Plaintiffs also contend that *Brown v. Waterbury Board of Education*, 247 F. Supp. 3d

196, 206 (D. Conn. 2017), supports their claim for prejudgment interest. The district court in

*Brown* found that "because [an] arbitration award d[id] not provide for all the relief to which [the

plaintiff] [wa]s legally entitled under Title VII," the arbitration award did not moot the plaintiff's

39

claims. *Id.* But Plaintiffs do not explain how *Brown* supports granting prejudgment interest on an arbitration award. The only time *Brown* mentions prejudgment interest is in a parenthetical citation: "[Plaintiff] is also entitled under Title VII to prejudgment interest and punitive damages in addition to her lost overtime, back pay, and bonuses. The Court agrees with *Schooler* that reinstatement, overtime, and back pay do not constitute 'all of the requested relief to which [Plaintiff] is legally entitled." *Id.* (quoting *Schooler v. Allied Tube & Conduit Corp.*, No. 98 C 7962, 2001 WL 12012, at *8 (N.D. Ill. Jan. 4, 2001)). But the *Brown* court altered the quote from *Schooler* to suggest that the *Schooler* court actually found that the plaintiff was entitled to prejudgment interest. The actual quote from *Schooler* is:

> Schooler responds to this argument by declaring that she is also entitled under Title VII to prejudgment interest and punitive damages in addition to her lost overtime, back pay, and bonuses. The Court agrees with Schooler that reinstatement, overtime, and backpay do not constitute "all of the requested relief to which [Schooler] is legally entitled."

*Id.* at *8. The *Schooler* court never actually decided whether or not the plaintiff was entitled to prejudgment interest. *Id.* And, regardless, the question is not whether prejudgment interest is generally available in Title VII cases—*Frey* holds that it is. The question is whether the Court can order prejudgment interest on the arbitrator's award. Neither *Schooler* nor *Brown* address that question.

Plaintiffs dispute RICHD's material fact that "the arbitrator entered an award granting each of the Plaintiffs reinstatement of their employment with full back pay and benefits," RICHD's Mot. Summ. J. 9 (quotation marks omitted), because "Plaintiffs were awarded back pay and benefits, but not full backpay and benefits," Pls.' Resp. RICHD's Mot. Summ. J. 11 (quotation marks omitted). They argue that "the Arbitration Award did not make them 'whole.'" *Id.* If Plaintiffs want to determine whether their award does—or should—include unemployment

and medical bill reimbursements or prejudgment interest, federal Title VII litigation is not the proper mechanism for doing so. Rather, Plaintiffs should seek clarification, modification, or correction from the arbitrator, 710 ILCS 5/9, or modification, correction, or vacatur of the awards from a court, *id.* at 5/12–13. In short, the Court agrees with the County that Plaintiffs cannot use the present litigation as a backdoor to favorably adjust their arbitration awards in circumvention of the Illinois Uniform Arbitration Act. *See* RICHD's Mot. Summ. J. 22–23.

The County's motion for summary judgment on Plaintiffs' request for prejudgment interest on their arbitrator-awarded backpay, reimbursement for unemployment benefits, and reimbursement for medical bills is granted.

### 3.  $50,000.00 per Plaintiff Cap

Damages available in cases of intentional employment discrimination are limited on a per plaintiff basis based on the size of the employer. 42 U.S.C. § 1981a(b)(3). When an employer has between fifteen and one hundred employees, the award is capped at $50,000.00 per plaintiff. *Id.* (A). But when an employer has over one hundred employees, the per plaintiff cap increases incrementally, going as high as $300,000.00. *Id.* (B)–(D). Plaintiffs each request at least $75,000.00 in damages, Am. Compl. 9, 16, 22, 29, but the County argues they are statutorily limited to $50,000.00 each because RICHD employed significantly fewer than one hundred employees at the relevant time, RICHD's Mot. Summ. J. 26. But, for purposes of this litigation, the County employed Plaintiffs, not RICHD. *See supra* Part I. The Court does not see any information in the record indicating the number of people employed by the County. This means a question of material fact remains as to how many people the County employs. As such, granting summary judgment on this issue is inappropriate and the County's request is denied.

**CONCLUSION**

Accordingly, Defendant Rock Island County's Motion for Summary Judgment, ECF No. 43, is DENIED. Defendant Rock Island County Health Department is REMOVED from the case and its Motion for Summary Judgment or Partial Summary Judgment, ECF No. 45, is treated as if filed by Rock Island County and is GRANTED IN PART and DENIED IN PART. The County is granted summary judgment as to Plaintiffs' requests for punitive damages, prejudgment interest, and reimbursement. Plaintiffs Alexandra Sanchez, Deanna Brumbaugh, Diana Allen, and Sheri Duhme's Motion for Summary Judgment, ECF No. 48, is GRANTED IN PART and DENIED IN PART. Plaintiffs are granted summary judgment as to Rock Island County's assertion of undue hardship based on its ability to comply with industry best practices.

Pursuant to Local Rule 16.1(B), the parties are DIRECTED to participate in a settlement conference with Magistrate Judge Ronald Hanna prior to trial. The final pretrial order is due on February 17, 2026, the final pretrial conference is set for 1:00 p.m. on February 25, 2026, and the trial is set for 9:00 a.m. on March 23, 2026. The final pretrial conference and the trial will both take place in Courtroom A in the Rock Island Federal Courthouse at 1701 4th Ave. Rock Island, Illinois 61201.

Entered this 22nd day of January, 2026.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
